[Cite as *State v. Maines*, 2020-Ohio-5620.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

STATE OF OHIO,                    :

    Plaintiff-Appellee,      :

                              No. 109196

v.                               :

DESHAWN MAINES,                   :

    Defendant-Appellant.     :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 10, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-628849-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Tasha L. Forchione, Assistant Prosecuting Attorney, *for appellee.*

Gloria L. Smith, Attorney & Counselor at Law L.L.C., and Gloria L. Smith, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Deshawn Maines appeals the six-year sentence imposed after he pled guilty to one count of burglary, one count of receiving stolen

property and one count of criminal damaging or endangering.  Maines contends that his sentence on the burglary count is contrary to law because the trial court failed to consider the purposes and principles of sentencing under R.C. 2929.11 and the sentencing factors under R.C. 2929.12 when sentencing him.  He also contends that the record clearly and convincingly does not support his six-year prison sentence.  For the reasons that follow, we affirm.

**Procedural History and Factual Background**

{¶ 2}  On May 23, 2018, a Cuyahoga County Grand Jury indicted Maines on four counts: one count of burglary, a second-degree felony (Count 1); one count of theft, a fifth-degree felony (Count 2); one count of receiving stolen property, a first-degree misdemeanor (Count 3); and one count of criminal damaging or endangering, a second-degree misdemeanor (Count 4).

{¶ 3}  The charges arose out of an incident that occurred on or about May 14, 2018, at a home on Lakeview Road in Cleveland.  At approximately 12:40 p.m., Maines broke into the residence and allegedly stole two televisions and a laptop.  The victims were at work at the time of the incident, but the incident was captured on the home's interior and exterior video surveillance system.  When one of the victims checked the video surveillance on her cell phone, she observed the incident as it was occurring and called 911.  Police responded and found Maines hiding behind an SUV across the street.  Maines was arrested.  A television remote was found in Maines' pocket.  One television and a laptop were recovered in a vacant

house nearby. Fingerprints collected from the recovered television matched Maines.

{¶ 4} Maines initially pled not guilty to all charges. The case was assigned to the mental health docket and Maines was referred to the court psychiatric clinic for a sanity evaluation.

{¶ 5} On September 20, 2018, the trial court held a final pretrial conference to review the case status. The parties stipulated to the findings of a sanity evaluation report prepared by Dr. Jennifer Franklin, dated September 14, 2018. In her report, Dr. Franklin opined that, although Maines "was suffering from a severe mental disease" that "may have added an impulsive quality to his behavior," his mental illness did not prevent Maines from understanding the wrongfulness of his actions at the time of the incident.

{¶ 6} The state then set forth the terms of its plea offer on the record, i.e., if Maines pled guilty to the burglary, receiving stolen property and criminal damaging or endangering counts (Counts 1, 3 and 4), the state would dismiss the theft count (Count 2). Maines discussed the plea offer with defense counsel and the trial court. Maines advised the trial court that he would like to review the sanity evaluation report and requested a few days to consider the state's plea offer. The parties agreed to come back to court the following week.

{¶ 7} On September 25, 2018, Maines agreed to accept the state's plea offer. The trial court conducted a Crim.R. 11(C) plea colloquy, advising Maines of his constitutional rights and confirming that he understood the rights he would be

waiving by entering his guilty pleas, the effect of his guilty pleas and the potential sentences he faced by pleading guilty. The trial court further confirmed that Maines understood, prior to entering his guilty pleas, that "the maximum sentence you're facing is eight years if I send you to prison" and that the trial court had not promised Maines any particular sentence. Maines acknowledged that no promises or threats had been made to induce him to enter his guilty pleas and that his guilty pleas were being entered knowingly, intelligently and voluntarily. Maines then pled guilty in accordance with the plea agreement.

{¶ 8} The trial court found that Maines understood the nature of the charges against him, the maximum sentence he was facing, the constitutional rights he was waiving and that he was "mak[ing] a knowing, intelligent, and voluntary plea." The trial court accepted Maines' guilty pleas, found him guilty of the offenses to which he had pled and dismissed the theft count. The trial court referred Maines for a presentencing investigation and report ("PSI") and a TASC substance abuse assessment.

{¶ 9} Maines was sentenced on November 7, 2018. The assistant prosecutor, one of the victims, the investigating detective, defense counsel and Maines spoke at the sentencing hearing. The assistant prosecutor began by detailing Maines' "lengthy, lengthy, lengthy" criminal record dating back to the early 1990s:

> Mr. Maines does have a lengthy, lengthy, lengthy criminal record. In his LEADS report, 92 cycles. In reality he doesn't have quite 92 convictions, but they do date back from 1993. They're all separate instances of two thefts from '93, two RSPs from '93 — I'm sorry, three thefts in '93, another theft in '95, another theft in '96, burglary in 2000,

drug possession in 2000, attempted robbery in 2003, another theft in 2003, two more thefts in 2005, another theft in 2006, a robbery in 2006, another robbery in 2008, a theft in 2008, RSP along with forgery, misuse of credit cards and theft in 2012, another burglary and RSP in 2012, another theft in 2013, another attempted RSP of a motor vehicle in 2013, a theft in 2016, an identity fraud in 2017, another theft and identity fraud in 2017, and finally one last theft out of Lake County again in 2017.

{¶ 10} The assistant prosecutor then described the incident and showed portions of the video surveillance footage of the incident. According to the assistant prosecutor, Maines first attempted to break into one of the victim's vehicles, damaging the vehicle. The video surveillance footage shows that after speaking with a neighbor, Maines waited on the front porch of the victims' home. Once the neighbor drove away, Maines pulled a tool out of his pocket and attempted to enter the house, first by using the tool and then by breaking a window with a brick he had retrieved from the back of the house. After each failed attempt to break into the home, Maines looked around to see if anyone was watching. Maines ultimately entered the home by kicking in the door. The video surveillance footage shows that once inside the home, Maines detached a television and associated wiring from the wall, placed a remote in his back pocket and picked up a laptop computer. The video surveillance footage also Maines carrying a television and remote out of the home. The state requested a minimum prison term of five years.

{¶ 11} One of the victims spoke regarding the sense of violation she felt as she watched Maines, in real time, enter, go through her home and take her belongings. She described the loss of security and "peace of mind" she experienced

as a result of the incident and her continuing fear and nervousness — day and night — that someone is watching her or will come back to her house. She requested that Maines receive a maximum sentence.

{¶ 12} Cleveland police detective Christopher Howard, who investigated the incident, stated that during the 18 years he had worked as a police officer, he had "come across a handful of people as bad as [Maines]" and that his record was "one of the worst" he had ever seen. Detective Howard indicated that Maines "preys on the hardworking citizens of the City of Cleveland wherever he lives and steals and takes and does what he wants." He stated that "maybe it's a mental health thing" but that, in his view, "[t]he person in [the surveillance] video was not in crisis, clearly was not a mental person in crisis. It was a thief committing a criminal offense" and "[h]e's not going to stop." Detective Howard requested that Maines receive a maximum sentence.

{¶ 13} Defense counsel acknowledged that Maines' criminal history was "extensive, extensive, extensive" and "horrific" but stated that "this doesn't happen in a vacuum" and requested that Maines' significant mental health history be taken into account when sentencing him. Defense counsel noted that Maines had been physically and sexually abused as a child, that "his entire life ha[d] been riddled with mental health issues, physical issues, with abuse issues," that Maines had been repeatedly diagnosed with "severe mental health disorders" and that Maines continued to suffer from "tremendous physical issues" due to years of substance abuse and neglect.

{¶ 14} Defense counsel pointed out that most of Maines' prior offenses were theft-related offenses that did not involve physical harm to others and that Maines had been imprisoned on multiple, prior occasions but that prison "hasn't served as a deterrent." Defense counsel stated that a representative from Signature Health had authored a report in which she proposed a plan that could get Maines "back on track" if he were to be placed on probation.

{¶ 15} Maines also addressed the trial court. He stated that he regretted what he had done and that he knew what he had done was wrong. Maines, however, denied that he went to the victims' home with the intention of burglarizing it. Maines claimed that he had gone to the victims' home to retrieve a stolen television that belonged to him and that he broke into the home because he thought the victims were at home but were hiding from him: "I was trying to get them to come out [of] the house and they didn't. * * * I thought they was hiding from me. I thought they weren't coming out. And I did go in there and take the TV. I took the TV because I felt the TV was mines [sic]."

{¶ 16} After reviewing the PSI, the substance abuse assessment and a mental health assessment from the Centers for Children and Families (where Maines had been receiving services) and considering all the statements made at the sentencing hearing, the trial court sentenced Maines to an aggregate sentence of six years: six years on the burglary count, 180 days on the receiving stolen property count and 90 days on the criminal damaging or endangering count, all of which were to be served

concurrently. The trial court also imposed three years of mandatory postrelease control. The trial court waived fines and costs.

{¶ 17} In its November 7, 2018 sentencing journal entry, the trial court set forth the sentences imposed at the sentencing hearing and stated: "The court considered all required factors of the law. The court finds that prison is consistent with the purpose of R.C. 2929.11."

{¶ 18} On November 20, 2019, this court granted Maines' motion for a delayed appeal. He raises the following sole assignment of error for review:

> The six[-]year prison sentence is contrary to law and not supported by the record.

**Law and Analysis**

{¶ 19} Maines argues that his sentence on the burglary count should be vacated because the trial court failed to consider the purposes and principles of sentencing under R.C. 2929.11 and the sentencing factors under R.C. 2929.12 when sentencing him to a six-year prison term. In the alternative, Maines contends that his prison sentence should be modified to probation because the record does not support the imposition of a six-year prison sentence. Maines' arguments are meritless.

### Compliance with R.C. 2929.11 and 2929.12

{¶ 20} We review felony sentences under the standard set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1, 21. R.C. 2953.08(G)(2) provides that when reviewing felony sentences, the

appellate "shall review the record, including the findings underlying the sentence * * * given by the sentencing court" and that it "may increase, reduce, or otherwise modify a sentence * * * or may vacate the sentence and remand the matter to the sentencing court for resentencing" if it "clearly and convincingly finds" that (1) "the record does not support the sentencing court's findings" under particular statutory provisions that do not apply here or (2) "the sentence is otherwise contrary to law."

{¶ 21} A sentence is "contrary to law" if it falls outside the statutory range for the offense or if the trial court fails to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors set forth in R.C. 2929.12 when sentencing a defendant for a felony offense. *See, e.g., State v. Clay*, 8th Dist. Cuyahoga No. 108500, 2020-Ohio-1499, ¶ 26, citing *State v. Pawlak*, 8th Dist. Cuyahoga No. 103444, 2016-Ohio-5926, ¶ 58.

{¶ 22} Pursuant to R.C. 2929.11, a sentence imposed for a felony shall be "reasonably calculated" to achieve "three overriding purposes of felony sentencing" — (1) to protect the public from future crime by the offender and others, (2) to punish the offender and (3) to promote the effective rehabilitation of the offender — "using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." R.C. 2929.11(A), (B). In addition, the sentence imposed "shall be commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim" and "consistent with sentences imposed for similar crimes committed by similar offenders." R.C. 2929.11(B).

**{¶ 23}** Unless otherwise required by R.C. 2929.13 or 2929.14, a sentencing court imposing a felony sentence "has discretion to determine the most effective way to comply" with these purposes and principles of sentencing. R.C. 2929.12(A). R.C. 2929.12 sets forth a nonexhaustive list of factors related to the seriousness of the offender's conduct and the likelihood the offender will commit future crimes that the trial court must consider when imposing a sentence. R.C. 2929.12(A) provides that a court imposing a sentence on a felony offender "shall consider" the factors set forth in R.C. 2929.12(B) and (C) "relating to the seriousness of the conduct," the factors provided in R.C. 2929.12(D) and (E) "relating to the likelihood of the offender's recidivism" and the factors set forth in R.C. 2929.12(F) pertaining to the offender's military service. R.C. 2929.12(A) further provides that the sentencing court, "in addition," "may consider any other factors that are relevant to achieving those purposes and principles of sentencing."

**{¶ 24}** Maines does not dispute that his six-year prison sentence was within the statutory range for burglary. Rather, he contends that his sentence is contrary to law because the trial court (1) "never stated" that it was complying with the purposes and principles of felony sentencing," (2) "never mentioned" the purposes and principles of sentencing or any of the particular sentencing factors it was considering when sentencing Maines and (3) "never indicated" that it was "guided by" the purposes and principles of sentencing or any particular sentencing factors when sentencing Maines. Maines also contends that because the trial court knew, prior to the sentencing hearing, that Maines had a mental illness and a long criminal

history and nevertheless informed Maines, prior to the sentencing hearing, that it was "still considering probation," "the trial court was required to place more findings on the record before Maines could lawfully sentenced to prison." Maines cites no legal authority — other than R.C. 2929.11 and 2929.12 — in support of these contentions.

{¶ 25} First, although the trial court must *consider* the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the relevant sentencing factors listed in R.C. 2929.12 when sentencing a defendant on a felony, R.C. 2929.11 and 2929.12 are not "fact-finding statutes." *See, e.g., State v. Black*, 8th Dist. Cuyahoga No. 108551, 2020-Ohio-3117, ¶ 13; *State v. White*, 8th Dist. Cuyahoga No. 106580, 2018-Ohio-3414, ¶ 9. The trial court is not required to use particular language, make any specific findings on the record regarding its consideration of R.C. 2929.11 and 2929.12 or give specific reasons for imposing more than the minimum sentence. *State v. Herron*, 8th Dist. Cuyahoga No. 108775, 2020-Ohio-1620, ¶ 12; *Black* at ¶ 13; *State v. Gaines*, 8th Dist. Cuyahoga No. 103476, 2016-Ohio-4863, ¶ 11.

{¶ 26} A trial court's statement in its sentencing journal entry that it considered the required sentencing purposes, principles and factors, without more, is sufficient to fulfill a trial court's obligations under R.C. 2929.11 and 2929.12. *See, e.g., Herron* at ¶ 13; *White* at ¶ 9; *State v. Kronenberg*, 8th Dist. Cuyahoga No. 101403, 2015-Ohio-1020, ¶ 27 ("[T]his court has consistently recognized that a trial court's statement in the journal entry that it considered the required statutory

factors, without more, is sufficient to fulfill its obligations under the sentencing statutes.").

**{¶ 27}** Further, "'[c]onsideration of the factors is presumed unless the defendant affirmatively shows otherwise.'" *State v. Cooke*, 8th Dist. Cuyahoga No. 108824, 2020-Ohio-2725, ¶ 64, quoting *State v. Seith*, 8th Dist. Cuyahoga No. 104510, 2016-Ohio-8302, ¶ 12; *see also State v. Dawson*, 11th Dist. Lake No. 2015-L-109, 2016-Ohio-2800, ¶ 15 ("Absent evidence to the contrary, a reviewing court will presume the trial court considered all appropriate sentencing factors, even if the record is silent.").

**{¶ 28}** In this case, the trial court expressly stated in its sentencing journal entry that it had "considered all required factors of the law" and "finds that prison is consistent with the purpose of R.C. 2929.11." *See, e.g., State v. Williams*, 8th Dist. Cuyahoga No. 100042, 2014-Ohio-1618, ¶ 17 (observing that "[t]his court has refused to find that a sentence is contrary to law when the sentence is in the permissible range, and the court's journal entry states that it 'considered all required factors of the law' and 'finds that prison is consistent with the purposes of R.C. 2929.11'"). Further, although it was not required to do so, the trial court explained its rationale for imposing a prison sentence at the sentencing hearing as follows:

> I know you know right from wrong and that's why you had gone insanity defense because you knew you were doing wrong because you waited for those people to pass by so you could break into the house.
>
> Your mental illness is not an excuse. It's not. And your record is so unbelievably long with similar types of incidents. Unbelievably long. I can't put you on probation. You are going to serve a prison sentence,

and once you're released you're going to be on PRC for another three years. If you violate the terms and conditions of that supervision you can go back to prison for up to one half of the sentence that you're given, be charged with a felony called escape for failing to report. They could make your supervision harder or longer for you. Three years of PRC, that's mandatory.

I have a lot of people who I want to do well with their mental illness and I want them to succeed and I want to them to be stable and I want them to be healthy. That's where I always start, period. But when I'm given this, your record, watching that video, so disturbing, there's no way. And the doctors say the biggest predictor of future behavior is past behavior. So if I was going to predict what you would do on probation, my prediction would be that you would victimize another person. * * * And I predict that that is what would happen. That's not acceptable to me.

* * *

Sometimes mental illness is a mitigating factor and sometimes it's a dangerous factor. So with your record I have to say if you're blaming this on your mental illness then your mental illness makes you more dangerous.

{¶ 29} Maines has not demonstrated that the trial court failed to consider the purposes and principles of sentencing under R.C. 2929.11 or the sentencing factors under R.C. 2929.12 when sentencing Maines. The trial court was not required to demonstrate how its sentence served each of the purposes and principles of sentencing or to identify or explain its evaluation of each relevant sentencing factor in order to comply with R.C. 2929.11 and 2929.12.

{¶ 30} Accordingly, we find that the trial court complied with its obligations under R.C. 2929.11 and 2929.12 and that Maines' sentence was not contrary to law.

**Sentence Supported by the Record**

{¶ 31} Maines also contends that his six-year prison sentence is clearly and convincingly not supported by the record and that this court should, therefore, modify his prison sentence to probation.

{¶ 32} Although an appellate court must conduct a "meaningful review" of a trial court's sentence, *see, e.g., State v. Johnson*, 8th Dist. Cuyahoga No. 97579, 2012-Ohio-2508, ¶ 6, a trial court's sentencing decision is entitled to deference; we are not permitted to simply substitute our judgment for that of the trial court. *See, e.g., State v. Shivers*, 8th Dist. Cuyahoga No. 105621, 2018-Ohio-99, ¶ 9; *State v. Franklin*, 8th Dist. Cuyahoga No. 107482, 2019-Ohio-3760, ¶ 47.

{¶ 33} Where, as here, a sentence is imposed "solely after consideration of the factors in R.C. 2929.11 and 2929.12," "[a]n appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence." *Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, at ¶ 23. "'Clear and convincing evidence is that measure or degree of proof * * * which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Franklin* at ¶ 29, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. This is an "extremely deferential" standard of review. *State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453, ¶ 21 (8th Dist.).

{¶ 34} Maines argues that the record does not support a six-year prison sentence "based upon the trial court's statements prior to the plea hearing." Specifically, Maines contends that because the trial court told Maines prior to the change-of-plea hearing that it was still considering probation and because the trial court "was aware," at that time, that Maines had a long history of theft-related offenses, that Maines had known the difference between right and wrong at the time of the incident and that Maines' mental illness may have contributed to his actions, (1) the trial court could not rely on "those exact same facts" to impose a six-year prison sentence and (2) therefore, there is no support in the record for the trial court's imposition of a six-year prior sentence. We disagree.

{¶ 35} At the final pretrial conference, the trial court made it clear that although Maines was eligible for probation, there was a presumption that he would receive a prison sentence. The trial court further informed Maines that, if convicted of the burglary count, he could receive a prison sentence of two to eight years and that, if convicted of all four counts, he could receive a maximum prison sentence of nine years, if consecutive sentences were to be imposed on the two felony counts:

> And you're eligible for probation, but the presumption in your case is prison. That means I start at the idea of sending you to prison and then if there's things that I think, Oh, that's a good thing, and that's a good thing, and that's a good thing, then I could maybe put you on probation. So, one of the things I look at is your record and your history. That weighs on how I decide prison or probation, how much time. So those things are all up in the air.

{¶ 36} The trial court also made it clear that it would not decide what would be an appropriate sentence prior to the sentencing hearing and would, instead, wait to receive all relevant information before making a decision on sentencing:

THE DEFENDANT:  Do things matter, what was going on at the time of the situation and before the situation?  Do that matter?  Or it just matter because you did something wrong?

THE COURT:  No, I mean, I listen to all of that.  So I would say the answer to your question is yes, it does matter.  I do take into consideration what was going on, you know.  * * *

If you plead, then I have to listen to everything and take everything into consideration, not just your criminal record, but also what they're saying in this [sanity evaluation report] and what you say, and then I have to make a decision, what I think is an appropriate decision.

* * *


THE DEFENDANT:  * * * When I plead, if I take a plea, do I get to tell you what's going on, or no?

THE COURT:  Normally, I wait until I sentence you to hear from you about that.  So, in my head and in my brain, I look at those as two separate things.

THE DEFENDANT:  Okay.

THE COURT: The plea is one thing.  That's me making sure you understand what you're pleading to, what the time is that you're facing, and that you're waiving your right to a trial, that you're giving up your right to a trial.  That's what I think of the plea as being.  So I'm not even in the mind-set of thinking, Well, what happened here, what does he want to say.  So when I come in for sentencing, then my mind is all about what do you have to say, and what does the State have to say, and was anybody injured, and what happened, and what about you, and what's going on with you. * * *

I use those things in a couple of ways, Mr. Maines. One, I'm trying to make a decision, do I want to put you on probation. Two, if I'm giving you prison time, I use those things to decide how much prison time

should he be getting. * * * So that's how I use the stuff. I'm trying to decide probation or prison. If I'm giving you * * * prison, how much time should I be giving you? Is it enough to give you — can I accomplish — can I do what I'm trying to do in the minimum amount of time, or do I need to give you more time? So those are the things that I have to make decisions about, right? * * * That's some insight into how I'm thinking in my head about what's going on. But, before we even get there, you have to do some thinking or you have to make a decision about what you want to do; and if you want to have a trial, you can have a trial.

{¶ 37} The trial court reiterated this point before Maines entered his guilty pleas at the change-of-plea hearing:

THE COURT: * * * Let's go over the penalties again, okay. Count 1 is burglary, carries two to eight years in prison, a fine of up to $20,000,[1] and three years of mandatory Post-Release Control if you go to prison.

Count 3, receiving stolen property, is a misdemeanor of the first degree, carries up to 180 days in jail, and a fine of up to $1,000.

Count 4 is criminal damaging, it's a misdemeanor of the second degree, carries up to 90 days in jail, and a fine of up to $750.

The misdemeanors cannot be run consecutive to the burglary, so the maximum sentence you're facing is eight years if I send you to prison. Do you understand?

THE DEFENDANT: Yes.

* * *

THE COURT: All right. I can put you on probation in this case if I want to. This is going to be a difficult case for me to decide what to do. Do you understand?

THE DEFENDANT: Yes.

---

[1] Although the trial court initially stated that the burglary count carried a possible fine of up to $20,000, the trial court later clarified that it carried a possible fine of up to $15,000.

THE COURT: I haven't promised you any particular sentence, all right?

THE DEFENDANT: No.

{¶ 38} After the trial court accepted Maines' guilty pleas and found him guilty of the offenses to which he had pled, Maines attempted to explain why he had done what he had done, identified steps he had taken to try and improve his life and described some of his current mental health and medical issues. The trial court, once again, stated that it had not yet decided whether to impose a prison sentence and was waiting to see what additional, relevant information it received at, or prior to, the sentencing hearing before making a decision:

THE COURT: * * * I don't know what I'm going to do. I've got to think about it. All right?

* * *

You know what, all that stuff is what we call mitigating evidence. It's all good stuff, because you have to show me the good stuff to combat what is going on here.

DEFENDANT: Yes, ma'am.

THE COURT: The prosecutor, she gets to speak, too. She will say whatever she wants or whatever the victims are telling her. Might sound very different than what you're telling me.

{¶ 39} After considering all of the relevant information made available to the trial court, including the sanity evaluation report, the PSI, the substance abuse assessment, additional information regarding Maines' mental health, the surveillance video of the incident and statements from the assistant prosecutor, one of the victims, the investigating detective, defense counsel and Maines, the trial

court decided to impose a six-year prison sentence. Simply because the trial court had indicated it was willing to consider probation does not mean the trial court was precluded from imposing a prison sentence once it received all of the relevant information, particularly, where, as here, there was a presumption of a prison sentence. Following a thorough review of the record in its entirety, we find no basis upon which we could conclude that the record clearly and convincingly does not support Maines' six-year prison sentence.

{¶ 40} As stated above, the parties stipulated to the findings in the sanity evaluation that Maines suffered from a severe mental illness but that his mental illness did not prevent Maines from understanding right from wrong and that Maines understood, at the time of the incident, that what he was doing was wrong. Further, at the sentencing hearing, Maines readily acknowledged that he knew what he was doing was wrong at the time of the incident. Although the sanity evaluation indicated that Maines' mental illness could have contributed to his impulsive behavior, as the trial court pointed out at the sentencing hearing, and as was apparently clear from the surveillance video, this incident was not the result of purely impulsive behavior. Maines stated that he took an Uber to the victims' home. Although he claimed to have broken into the victims' home believing that they had a stolen television that belonged to him, he first attempted to break into one of the victim's vehicles, causing damage to the vehicle. When a neighbor later observed him on the victims' porch, he waited until after the neighbor left to break into the home. After each failed break-in attempt, Maines looked around to see if anyone

was watching him before trying again. Further, although no one was physically harmed as a result of Maines' actions, Maines stated at the sentencing hearing that when he broke into the home, he believed the victims were inside, "hiding" from him. Accordingly, he broke into the home with the understanding that his actions could have resulted in a confrontation with the victims, presenting a further risk of harm.

{¶ 41} Although Maines' mental illness was one relevant factor to be considered in determining an appropriate sentence, there were others the trial court was required to consider as well, including, the economic and emotional harm sustained by the victims, the fact that Maines committed the subject offenses while under community control, Maines' lengthy history of similar criminal offenses and Maines' unfavorable response to the sanctions imposed for his prior offenses. *See* R.C. 2929.12. At the time of the sentencing hearing, Maines was 48. The PSI reflects that from 1991 to 2017, Maines committed more than 55 theft-related offenses in separate incidents throughout Northeast Ohio.[2] Based on his history, Maines' PSI indicates that he has a "high" risk for recidivism.

---

[2] The PSI reflects that, in addition to convictions out of the Cuyahoga County Court of Common Pleas, the Lake County Court of Common Pleas and the Summit County Court of Common Pleas, Maines had convictions out of the Bedford, Cleveland, Mentor, Willoughby, Akron, Parma, Shaker Heights, Euclid, Rocky River, Barberton, Garfield Heights, Lakewood, Cleveland Heights and South Euclid Municipal Courts. According to the PSI, prior to this incident, Maines was convicted of one or more felony or misdemeanor theft-related offenses in each of the following years: 1991, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2002, 2003, 2005, 2006, 2007, 2008, 2010, 2012, 2013, 2015, 2016 and 2017.

{¶ 42} The record reflects that, when sentencing Maines, the trial court considered Maines' mental illness as a factor relevant to his sentence but nevertheless concluded that, given other relevant factors, a six-year prison sentence was necessary to serve as a deterrent and protect the public. Given the nature of Maines' conduct, the "breadth of his criminality" and the high risk of recidivism, we cannot say that Maines' six-year prison sentence is clearly and convincingly unsupported by the record. *See, e.g., Clay*, 2020-Ohio-1499, at ¶ 33.

{¶ 43} The record reflects that the trial court thoroughly and thoughtfully considered the purposes and principles of sentencing under R.C. 2929.11, the relevant sentencing factors under R.C. 2929.12 and all of the relevant information presented at (or prior to) the sentencing hearing in imposing a six-year prison sentence. Maines has not shown that the record clearly and convincingly does not support his sentence. Accordingly, we overrule Maines' assignment of error.

{¶ 44} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

SEAN C. GALLAGHER, P.J., CONCURS;
PATRICIA ANN BLACKMON, J., CONCURS IN JUDGMENT ONLY WITH SEPARATE OPINION

PATRICIA ANN BLACKMON, J., CONCURRING IN JUDGMENT ONLY:

{¶ 45} I concur with the majority opinion and write separately to voice my concerns with the state of the mental health prison complex. Clearly, the trial court applied R.C. 2929.11 and the sentencing factors under R.C. 2929.12 when it sentenced Maines to a six-year prison term. However, I was struck by the portion of the record that establishes that, although Maines knew the wrongfulness of his conduct, he "was suffering from a severe mental disease" that "may have added an impulsive quality to his behavior." That being said, I do not disregard the terrifying nature of what happened to the victim in this case. The victim witnessed Maines entering her home and had to have felt the pain emotionally of having someone walk freely into her home without regard to her privacy and space. We can only imagine what she witnessed. And yet I raise my voice to utter, the system is not working for either in this case, especially the victim.

{¶ 46} A Bureau of Justice Statistics survey has estimated that 16 percent of all state prison and local jail inmates incarcerated in American prisons and jails are

mentally ill. *See* https://www.ncjrs.gov<pdffiles1>bja Mental Health Courts - National Criminal Justice Reference (accessed Nov. 12, 2020). Other researchers have found that found one-third of inmates have severe mental illness or substance abuse issues and that these inmates on average stayed in the jail 77 percent longer than other inmates. *See* https://www.cleveland.com/metro/2020/11/cuyahoga-county-jail-inmate-accused-of-beating-cellmate-to-death-placed-in-general-population-despite-history-of-attacking-inmates-court-records-sources-say.html (accessed Nov. 12, 2020).

{¶ 47} This high number is traditionally attributed to deinstitutionalization that did not achieve the results that were hoped for, causing the criminal justice system to increasingly absorb individuals with mental health issues. The criminal justice system has increasingly come to serve as the "social service system of last resort." *See* https:// www.ncjrs.gov › pdffiles1 › bja Mental Health Courts - National Criminal Justice Reference (accessed Nov. 12, 2020). For those offenders whose illness does not meet the test of insanity under R.C. Chapter 2945, the need for treatment and help remains. Often, inmates do not get proper treatment.

{¶ 48} Here, the record shows that Maines has a "lengthy, lengthy, lengthy" criminal record dating back to the early 1990s:

> Mr. Maines does have a lengthy, lengthy, lengthy criminal record. In his LEADS report, 92 cycles. In reality he doesn't have quite 92 convictions, but they do date back from 1993. They're all separate instances of two thefts from '93, two RSPs from '93 — I'm sorry, three thefts in '93, another theft in '95, another theft in '96, burglary in 2000, drug possession in 2000, attempted robbery in 2003, another theft in 2003, two more thefts in 2005, another theft in 2006, a robbery in

2006, another robbery in 2008, a theft in 2008, RSP along with forgery, misuse of credit cards and theft in 2012, another burglary and RSP in 2012, another theft in 2013, another attempted RSP of a motor vehicle in 2013, a theft in 2016, an identity fraud in 2017, another theft and identity fraud in 2017, and finally one last theft out of Lake County again in 2017.

{¶ 49} To me, this shows that the court system has known for decades that Maines is in need of mental health treatment. However, the system has opted to continue jailing him with hopes that society will be safe from him for at least six years. The police detective and many others believe very strongly that he knows the difference between right and wrong. Maybe he does, but that is not the issue. Putting him in jail without properly addressing his mental health care is unbelievable. In this day and age, we know more about the brain and its control over behavior than ever before. Just because the justice system is weak in its understanding of the brain and its cognitive function does not mean that information is not available.

{¶ 50} I have talked to many friends and most are unwilling to believe that the criminal is not in control of his behavior. He should know right from wrong or have a functioning brain. Today, brain science can scan the brain and determine damage to the executive function part of the brain, the limbic emotional part of the brain, and the primitive brain. We really can determine with today's science that a person does not know the difference between right and wrong, if the executive function part of the brain is damaged.

{¶ 51} The executive function of the brain controls a whole host of areas, which includes behavior and self-regulation. Additionally, this part of the brain is the youngest part of the brain. The two oldest parts are faster, but self-regulation via the executive function part of the brain helps us to override the default, automatic negative response.

{¶ 52} Consequently, we as a society can either recognize that the new mental health facility is the prison system itself, or it is not. I ponder when will we get tired of this existing approach.